This is the L.B. Motion v. Playtika Holding Corp. Good afternoon, Your Honors. May it please the Court, I'm Lauren Ormsby for Lee v. Playtika. The District Court erred in at least three crucial ways into dismissing the strict liability complaint brought under Section 11 of the Securities Act, and that opinion should be reversed and the case allowed to proceed on the merits. For among other reasons that I'll dive into, the Court failed to apply controlling Second Circuit law to the relevant facts, predominantly JNCO Solar and the Macquarie case, and misunderstood the relevant facts and conflated materialization of risk with the actual risk that was not disposed, and also dismissed the case under the pure omissions theory that Item 105 required certain facts to be disposed in the registration statement. To start, while the business of online gaming apps was a bit new to me, what happened here is not new, and I think a helpful analogy is to look through the lens of a car company. If you imagine that Ford and its key revenue driver is a Bronco, and Ford tells investors that the revenue-driving Bronco is consistently running with constant reliability based on the user reaction to the way it drives, but they don't mention that they've already started a months-long project to completely rebuild the Bronco's engine, replacing every component from ground up. This rebuild is a risk to user satisfaction and revenues, but they say nothing except for some generic warnings that cars sometimes need maintenance and upgrades, and mechanical work can cause problems. Doesn't the complaint suggest that in the technology field there's a continual need for updating? There is, and that's a differentiating here. There is a continual need for updating. That's not what happened here to these two primary games. To the Slotomania and the Bingo Blitz game, this was like saying, my car runs great, but you're not telling people that the engine is being rebuilt in the garage as they speak, and that's going to cause some problems going forward and some anticipated problems going forward. That's not exactly fair. What they said is that Playticket must constantly enhance and upgrade the game with new features and content that players find attractive. It seems to me that that's rather straightforwardly telling consumers that these products are constantly in a process of change and innovation in response to all this competition among the games that our sons and daughters play. It's a different world than the car in many ways, but that constant feature update is actually the false statements that we rely on here. There is a difference between being able to constantly update with features and what your engine, which is the core code on how these products are written, how it's operating. Our premise here is that these games relied and needed constant features in order to drag in that user that provided this billion dollars of revenue every year for these two games alone. In order to give those constant features, yes, the games needed updates and little fixes, and maybe when you plug in your phone, it gets an update. But what was going on here was the company, because the user base and the code that fueled these engines of these games was outdated and not working. They had to go back to the drawing board. For One Slalomania, they were rewriting and had to translate the whole code from one C script to JavaScript. And for the Bingo Blitz game, they had to go back and create a whole new user interface. So these are not little updates that generated features. These were rewrites of the actual games themselves that the company knew was going to, or at least posed a significant risk, would inhibit and would prevent the company from providing that constant cadence and constant flow of feature updates to its users. So we have the actual 20 times false statements in the registration statement alone about consistent and constant flow and constant cadence. Those are false and misleading because these overhauls, these rebuilds going on that were undisclosed threatened that very constant cadence. I could have missed something, but when I looked at the cautions in the S1, I'm not sure I saw that the company was limiting the magnitude or the importance of them. They said, we make these things all the time. We have to do it to keep up with competition and keep our products attractive. I don't see any language where they're saying, well, this applies only to small changes. It is the magnitude of the changes, respectfully, Your Honor. And some of those risk disclosures, which we're not alleging themselves are false and misleading, but defendants are using to negate the falsity of the statements that we do plead are false and misleading, do not indicate at all that half of their revenue is at risk because of these ongoing projects. Some of the risk disclosures you're talking — Well, if you read the registration statement, you would see the importance of these two games, right? You would absolutely see the importance of these two games. The problem is you're not seeing the importance of the actual overhaul of these two games that's posing a risk to investors. And if I just may, with some of these risk factors, one of them, they say, from time to time, we engage in systems integration or migration work that can result in interruptions. These were not systems integrations or migration work. These, again, were complete overhauls of these companies. They also said for a game to remain popular, we must constantly enhance and upgrade the game with new features. Again, that is not what was going on here. The new features is a necessity for the game to be popular, but these were not upgrades and enhancements. These were overhauls. What's the difference? The difference, Your Honor, is a feature is something that they came out with every week, every two weeks, like the CEO said, which drags a user in. It's an integral part of the game. In order to do those new features, you need a game that's operational and running and is not changing as we're speaking. What they were doing, because they were having these 18-month-long, month-long programs, very complicated, worked on by hundreds of people, they knew that that was going to slow down their ability to issue new features on these games. And you're saying that all of these cautionary phrases didn't go far enough. Exactly. And if you look at the Second Circuit's guidance that is provided, and I have to note that the district court did not cite JNCO Solar, did not cite Ron Bakley Chang, obviously did not cite Macquarie because it hadn't come out yet. It cited a district court case that preceded JNCO Solar and had this, we're in a category that's broad enough to cover these concealed risks. That simply is not the standard in the Second Circuit. If a reasonable investor, which is how you have to look at this, is missing integral facts that deprive it of a way that causes the investor to make an overly optimistic assessment of the risk or that it substantially affects their calculations of the probability of risk, that is misleading. In a nutshell, your theory is that even though investors were advised that these games are being changed and upgraded all the time, the changes that were made to these games were so big that the company should have sold something else. Right. I think the risks cover your kind of everyday upgrades that these games would expect in any game. You know, you plug in your Apple iPhone probably every few months to upgrade the operating system. They're constantly making tweaks. They're not constantly changing the actual chip that drives the phone. So when the district court noted that the ability to maintain this constant cadence was uncertain because of systems integration and migration work, you say this wasn't systems integration or migration work, and potential failures in implementing new systems and transitioning data. First of all, I do find those disclosures are too vague and not exactly what was going on here at all. That would encompass quite a lot. They also don't represent, Your Honor, what they knew were the facts on the ground. You can have a risk that warns someone, hey, cars need maintenance. But if you're telling them, but my engine's getting reconfigured and built from the ground up, that's important. That warning does not go far enough for a reasonable investor to fully assess the facts, the probability of the risk, and to give them an assessment. An investor, if they had known, and they could have spun it however they want, but if an investor was told, hey, we think it's going to be great, but just so you know, half of our revenue, $1 billion a year of our $2 billion revenue, we're going to need to overhaul those games. They're a little outdated. The user interface is getting a little spotty. We're rebuilding them. We're recoding them. It's going to take a year or two, but we think it's going to be great. That investor would have had that knowledge. They could have assessed the risk. They could have said, I believe in this company. I'm still going to invest in the IPO at $27. They could have said, I'm going to hang back and see how those overhauls go. Or they could have collectively forced the price down, incorporating that risk. They did not know that, and these were huge deals, and we have four CWs. And remind you, this is a Rule 8 planning, but we have four CWs that say these were a big deal. They've had problems with this before, and if you slow down even your generation of these features that drag users in, even a little bit, that hurts revenues. And it did, because shortly thereafter, two quarters later, they disposed that revenues were down, and two reasons for it. One of them was fewer features for these two games because of these infrastructure overhauls, and the market cared, and the stock price dropped 23% in a single day. So it did matter. They didn't have all the facts for them, and they were entitled to them, especially when you look at this case under the Section 11 framework. And we're not just talking about omissions under Item 105, which are very viable, but you have 20 statements repeated in the registration statement, most of them never repeated again. But the company used them to sell this IPO. They didn't put them in their next 10-K. They didn't put them in their next 10-Q. But they said them 20 times, and they got investors to invest a lot of money, almost $2 billion, in this platform without telling them very salient facts. Thank you. Thank you. Your premier adversary. Good morning, Your Honors. Appellants use the term constant cadence and its synonyms more than 50 times in their amended complaint. Where does the term constant cadence come from? It's mentioned a single time in Platika's registration statement, and I quote, Throughout the life cycle of our games, we dedicate substantial operational resources and team members to support a constant cadence of novel content and feature creation that drives conversion and continued modernization. So Platika did not promise it would always maintain a constant cadence. It only promised it would devote substantial operational resources to doing so. Appellants do not allege that Platika ever stopped devoting substantial operational resources to that task. That is the primary statement of current fact that is challenged by appellants and is indisputably true. The only other statement of current fact that is mentioned in the amended complaint is Platika's statement in the registration statement that, and I quote, We provide a constant flow of new content that is highly personalized to users based on their gameplay behavior. And again, this statement is indisputably true. The amended complaint does not allege that Platika failed at the time of the IPO to provide a constant flow of new content. The remaining statements challenged by appellants were all forward-looking about Platika's ability to maintain a constant cadence in the future. Platika expressly disclosed, as you already noted, Your Honor, that it might not be able to in the future. But appellants argue that disclosure was not enough. Specifically, appellants argue in their reply brief that, and I quote, The complaint alleges that Platika had virtual certainty that there would be a drop in the constant and consistent cadence of product features for its top two games because of the ongoing infrastructure overhauls. On that basis, appellants argue that Platika failed to disclose a risk that had already materialized at the time of the IPO. But appellants are bound by the allegations in the amended complaint. The amended complaint does not allege the risk already had materialized at the time of the IPO. The amended complaint instead expressly alleges, on at least three separate occasions in paragraphs 15, 153, and 177, that the risk materialized in Q3 of 2021, many months after the IPO, which took place in Q1 of 2021. Just one example, I'll read to you paragraph 153, and I quote, This risk materialized for Slotomania in 3Q of 2021. Again, the complaint alleges the risk materialized long after the IPO, which happened in Q1. The amended complaint also does not use the words virtual certainty or allege facts that support it was a virtual certainty at the time of the IPO that Platika would not achieve a constant cadence in the future. Appellants do not allege that Platika was experiencing problems with the Bingo Blitz and Slotomania upgrades at the time of the IPO. They do not allege that historically a single Platika game ever experienced a disruption in its constant cadence as a result of a failed software upgrade. They do mention Caesar in the complaint, in the amended complaint, and they allege that Caesar experienced a migration, a software migration that they compared to Slotomania. They don't allege that Caesar had experienced a disruption in its constant cadence or any other problems with that migration. It was a successful migration. That's paragraph 151 of their complaint. Indeed, at the time of the IPO, appellants themselves allege that Platika first tested any changes internally at Platika before then testing it on a small population of 2% of Platika's users and then slowly increasing the percentage of users, fixing any issues along the way. So Platika's history and process, as alleged by the appellants, gave Platika every reason to believe that these upgrades would not cause any disruption. Well, they rely on CW1, who talked about a current plan for future development and a near certainty or a planned redesign, new features, was going to decrease by 5% to 10%. Are you going to make this particular witness? Yes, they argue that CW1, and this is their reply, they say that, and I quote, Platika had a plan at the time of the IPO that the undisclosed redesign of Bingle Blitz would cause the future redeployment roadmap to decrease between 5% and 10%. That's not what CW1 has alleged to have stated in the amended complaint. The amended complaint alleges that CW1 stated Platika began implementing the Bingle Blitz upgrade, and I quote, sometime in February or March of 2021, which is after the IPO, which took place on January 15th of 2021. Appellants then try to extend that backwards in time by saying CW1 stated, and this is their reply, that the project would have begun months prior to February or March of 2021. But again, that argument is not supported by the amended complaint. The amended complaint does not say that the supposed plan existed before the IPO. The amended complaint only alleges that CW1 stated that ARC comes before implementation and the artists will be working on pictures prior to the IPO. The amended complaint, that's paragraphs 160 through 61 of the amended complaint. The amended complaint does not allege that the artists developed the supposed plan for a 5% to 10% decrease in new features. The amended complaint does not allege who devised the supposed plan, whether the plan was ever implemented, how CW1 supposedly was aware of the supposed plan, or even if the plan existed at the time of the IPO. CW1 is not even alleged to have worked on Bingle Blitz. And the district court picked up on all that, and that's the basis for a large part of its holding. Just as importantly, appellants never explain why a 5% to 10% drop in the pace of new feature releases would fail to be a constant cadence. Why would nine new feature releases instead of 10 per day or 18 per week instead of 20, why would that not be a constant cadence? Platika's registration statement disclosed that its pace of new feature releases would change. It could be every week, every two weeks or so, daily, sometimes hourly. A 5% to 10% decrease would fall well within those parameters. They don't explain that either. Contrary to appellants' argument, the amended complaint simply does not allege facts supporting that Platika had virtual certainty that it would fail to maintain a constant cadence in the future. The district court, therefore, correctly dismissed the case under the case law cited by appellants themselves. Appellants cited a series of cases where something bad had already happened, but a risk factor made it sound as if the bad thing was just hypothetical. Appellants cited the Ninth Circuit's Facebook decision, but in that case, the risk factor said a data breach could result in the misuse of personal data of customers when Cambridge Analytica, already at that time, to the knowledge of Facebook, had misused more than 30 million Facebook users' information. Appellants cite the Alphabet decision. That also involved a data breach that had already happened. And we just heard about Jenko Solar. But Jenko Solar, again, and I'm quoting, it involved then ongoing and serious pollution violations. Those ongoing and serious pollution violations existed at the time of the disclosure, but the disclosure only said we might have a pollution violation when they knew it already happened. Here, nothing bad had happened at the time of the disclosures. There's nothing inherently bad about software updates. Every company has to update its technology regularly. The alleged risk was not that an upgrade would be implemented. The risk was a disruption to constant cadence from a failed upgrade. And that's why the word constant cadence and its synonyms are mentioned 50 times in the amended complaint. The fact of an upgrade could not be the risk. As you pointed out, Platika disclosed repeatedly that a variety of technology, network, and software upgrades were being implemented constantly, including in a paragraph specifically discussing Bingel Blitz and Slotomania. Upgrades were both disclosed and unremarkable. And they also disclosed a migration, which was with Slotomania, that they do software migrations, which the complaint alleges is what Slotomania was undergoing. We cited several cases that granted motion to dismiss because it was not apparent that a technology upgrade would fail at the time of the disclosure. Appellants have argued that Slotomania and Bingel Blitz, those updates were somehow different because they were particularly important updates for financially important games. But if a software upgrade failed and stopped the release of new features for any of Platika's games, that would have caused material harm to Platika's reputation and revenues. And Platika said as much in its risk disclosures, as you've already noted. Moreover, the cases we cited involved updates that were just as important as these updates for Bingel Blitz and Slotomania. In the Nokia case, for example, it was a cell phone company. And the cell phone company experienced problems with its entire operating system for its next generation of cell phones. Very important. Weight Watchers involved an entirely new software platform for the entire company. In both cases, despite the importance of these upgrades, the courts granted motions to dismiss because the company did not know or have reason to know the software upgrade would fail at the time of the disclosures at issue. Platika disclosed that all its games, including specifically Bingel Blitz and Slotomania, regularly received technology upgrades. Platika specifically disclosed that its games went through software migrations regularly, which is the exact upgraded issue here for Slotomania. Platika even expressly disclosed that it might not be able to maintain a constant cadence of new features. Appellants don't allege anything bad had happened at the time of the IPO. They don't allege that Platika had stopped rolling out new features on a constant cadence at the time of the IPO. They don't allege that Platika experienced any problems with the software updates to Slotomania and Bingel Blitz at the time of the IPO. They don't allege facts, certainly, that support a virtual certainty that Platika would be unable to maintain a constant cadence as a result of these two technology upgrades. There simply was nothing more.  Let me ask you. You've mentioned constant cadence often. How would you define a constant cadence? Well, I think, Your Honor, there is no objective definition here, which is why we also made the argument that this is appropriate to the trial court and, again, to this court. The trial court did not need to reach that issue. But here, the company had disclosed that a constant cadence could be hourly, could be daily, could be weekly, could be every two weeks. There's no objective way to verify whether a constant cadence had been met or not, which is why it's puffery, and they don't allege here ever that we somehow did not meet, did not release new features within those parameters that were disclosed. Unless you have any other questions, I'll just close by noting that the district court found that Platika has not sufficiently pleaded that the risks associated with the infrastructure overhauls to Slotamine and Bingle Blitz had already materialized at the time of the registration statement and that Platika's disclosures were broad enough to cover the risk alleged here, and the district court was correct on both counts. It should be affirmed. Thank you. In your honors, I'd like to address probably the last point first and again go back to the broad enough to cover standard and the virtual certainty standard that defendants rely on, which is not the standard for how to address whether these statements themselves were misleading and whether the risk factors were sufficient to inform a reasonable investor of the probability of the risks. The risk that happened happened before the IPO. The risk that was known was that these overhauls posed a risk to the company's ability to issue this constant cadence of features that investors relied on. The harm materialized when the company admitted that these overhauls did impact its ability to issue a constant cadence of features because it issued less features, and that was a driver of its revenue loss in the third quarter. There is a conflation of the two, and I realize sometimes it's hard because you're talking about risk materialize and harm materialize, but the Court and the Second Circuit specifically, most recently in McQuarrie, did apply and did give you a definition for how to apply it. And here, especially under this late Section 11 pleading where knowledge is not a factor, it is clear, though, that the company didn't know or was aware that it was doing these overhauls. The timing issue with regard to Bingo Blitz, when it was being implemented and known to be implemented per RCW in February, the plan for that implementation existed one month before, probably six months before, and we allege that clearly in the complaint is that is how these projects happened. Is there anything in the registration statement that you claim is literally false? No, Your Honor. They are half-truths by virtue of what they did not tell investors. These are what they said is true, but what they omitted is what you are urging. Yes. At the time, their company did rely and did provide a constant cadence of new features that drove revenue specifically for these two games, but what they did not tell investors, and those were present statements that we deliver, and this is dependent, and this is how we get our revenue. These were our core strengths. They were in three specific sections of the registration statement. What differentiates our company from others? What are our core strengths? And what is our management discussion and analysis? They weren't posed hypothetically. They weren't promises. They were saying we do this, and this is what drives our revenue, and this is what makes us great, and this is why you should invest in us. And as for the timing, just to follow up with subtle meaning, I think it's undisputed, but they have admitted that that was an 18-month plan, so it was being implemented. And those risks were going on. They're rebuilding those engines as they speak, and they know and they plan that there will be disruptions, and they don't tell investors, and it's plain and simple. The facts of every case, you know, JNCO Solar and others are different, but in JNCO Solar, the standard is clear, and even there, the court found that the company's statements in the IPO were misleading because one month after the IPO, the company had already reported some environmental problems to the Chinese authority after the IPO, but had to assume that they knew of that at the time of the IPO, and the similar factors are applicable here. Unless your honors have any other questions, thank you for your time. Thank you both. Thank you both. Well argued, both sides.